UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

| | |
|---|---|
| ALFREDO MARRERO, | FIRST AMENDED COMPLAINT |
| Plaintiff, | |
| -against- | 14 CV 5562 (BMC) |
| CITY OF NEW YORK, POLICE OFFICER GREGORY LOMANGINO, POLICE OFFICER JOSEPH KOCH, and SERGEANT JAMES GEISSLER, | JURY TRIAL DEMANDED |
| Defendants. | |

---------------------------------------------------------------------------x

## NATURE OF THE ACTION

1. This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

3. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5. Plaintiff demands a trial by jury in this action.

## PARTIES

6. Plaintiff Alfredo Marrero ("Mr. Marrero") is a resident of the County of Queens, State of New York.

7. Defendant City of New York is a municipal organization organized under the laws of the State of New York.

8. Defendant City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant City of New York.

9. The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10. At all times relevant herein, Defendant Police Officer Gregory Lomangino ("Lomangino") was an officer, employee, and agent of Defendant City of New York.

11. At all times relevant herein, Defendant Lomangino was acting within the scope of his employment with Defendant City of New York.

12. At all times relevant herein, Defendant Lomangino was acting under color of state law.

13. Defendant Lomangino is sued in his individual and official capacities.

14. At all times relevant herein, Defendant Police Officer Joseph Koch ("Koch") was an officer, employee, and agent of Defendant The City of New York.

15. At all times relevant herein, Defendant Koch was acting within the scope of his employment with Defendant The City of New York.

16. At all times relevant herein, Defendant Koch was acting under color of state law.

17. Defendant Koch is sued in his individual and official capacities.

18. At all times relevant herein, Defendant Sergeant James Geissler ("Geissler") was an officer, employee, and agent of Defendant The City of New York.

19. At all times relevant herein, Defendant Geissler was acting within the scope of his employment with Defendant The City of New York.

20. At all times relevant herein, Defendant Geissler was acting under color of state law.

21. Defendant Geissler is sued in his individual and official capacities.

## STATEMENT OF FACTS

22. On November 1, 2011, Mr. Marrero was lawfully present at 57-07 Shore Front Parkway, Queens, New York ("Subject Location").

23. The Subject Location is part of an apartment complex known as Arverne View.

24. Mr. Marrero was there to visit his grandmother who depends on Mr. Marrero for some of her care.

25. Mr. Marrero's grandmother let Mr. Marrero into the Subject Location using the buzzer system present inside of her apartment and at the entrance to the Subject Location.

26. While in the Subject Location, Mr. Marrero was stopped by the individual defendants.

27. Mr. Marrero recognized the individual defendants because they and other officers had stopped and harassed him numerous times both on and off the Arverne View's premises, and had even been visited by the individual defendants and other officers at the apartment at Arverne View where he was a tenant.

28. Prior to November 1, 2011, the individual defendants, other members of the NYPD, and members of management of Arverne View had engaged in a pattern of conduct wherein they harassed, stopped, and searched Mr. Marrero on and off of Arverne View's property, and visited

Mr. Marrero at his apartment at Arverne View in an attempt to force Mr. Marrero to move from his apartment at Arverne View.

29. The individual defendants, other officers with the NYPD, and members of Arverne View engaged in this pattern of conduct because of personal animus they held against Mr. Marrero, and because they had no basis on which to remove Mr. Marrero from his apartment because he occupied what they knew to be a rent controlled apartment, and which they knew Arverne View accepted rental assistance for Mr. Marrero and his family from Section 8 and the New York City Department of Housing Preservation & Development.

30. The individual defendants asked Mr. Marrero if he was a tenant of the building.

31. Mr. Marrero responded that he was there visiting his grandmother, and that she had let him into the building.

32. Mr. Marrero further told the individual defendants that he was a tenant of Arverne View, but lived in a different building.

33. The individual defendants searched Mr. Marrero's person at the Subject Location.

34. The individual defendants told Mr. Marrero that he was trespassing and placed him under arrest.

35. Plaintiff's arrest was without probable cause.

36. Plaintiff was transported to a police precinct.

37. The individual defendants spoke with the Queens County District Attorneys' Office, individually and collectively lying to the Queens County District Attorney's Office that Mr. Marrero and had violated New York Penal Law § 140.10.

38. The individual defendants further lied to the Queens County District Attorneys' Office, stating that Mr. Marrero was not an invited guest at the Subject Location.

39. The individual defendants told the Queens County District Attorneys' Office that the basis of their knowledge that Mr. Marrero was trespassing at the Subject Location was their review of a tenant list and an affidavit of Michael Prush, manager of the building, who indicated in the affidavit that if someone was not on the tenant list and was not invited onto the premises by a tenant, that the person was trespassing at the Subject Location.

40. Both the tenant list and Michael Prush's affidavit were prepared under the NYPD's Clean Halls program.

41. The individual defendants provided the Queens County District Attorney's Office with the tenant list and the affidavit of Michael Prush.

42. At the time that the individual defendants reviewed the tenant list and the affidavit of Michael Prush, there were no attachments to either document, and no attachments to these documents were provided to the Queens County District Attorney's Office.

43. At the time that the individual defendants provided the tenant list and the affidavit of Michael Prush to the Queens County District Attorney's Office, they knew that these documents did not apply to Mr. Marrero in that they knew he was a tenant of Arverne View and had been invited into the Subject Location by the individual defendants.

44. Based on the individual defendants' fabricated allegations, the Queens County District Attorney's Office forwarded to Defendant Lomangino a Criminal Court Complaint.

45. The Criminal Court Complaint was reviewed and then signed by Defendant Lomangino.

46. When reviewing and signing the Criminal Court Complaint, Defendant Lomangino knew the allegations contained therein to be false.

47. The executed Criminal Court Complaint was then forwarded by Defendant Lomangino to the Queens County District Attorney's Office.

48. Legal process was issued against Mr. Marrero and, and Mr. Marrero and was subsequently arraigned.

49. During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the Queens County District Attorney's Office, *inter alia*, arrest reports, complaint reports, and tenant records.

50. Mr. Marrero and suffered damage as a result of Defendants' actions. Mr. Marrero and was deprived of liberty, suffered emotional distress, mental anguish, fear, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
*42 U.S.C. § 1983*

51. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

52. Defendants, by their conduct toward Plaintiff as alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

53. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages alleged herein.

## SECOND CAUSE OF ACTION
*Unlawful Stop and Search*

54. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

55. The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Marrero without reasonable suspicion.

56. As a direct and proximate result of this unlawful conduct, Mr. Marrero sustained the damages alleged herein.

## THIRD CAUSE OF ACTION
*False Arrest*

57. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

58. The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Marrero without probable cause.

59. As a direct and proximate result of this unlawful conduct, Mr. Marrero sustained the damages alleged herein.

## FOURTH CAUSE OF ACTION
*Denial of Substantive Due Process*

60. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

61. The individual defendants created false evidence against Mr. Marrero.

62. The individual defendants forwarded false evidence to prosecutors in the Queens County District Attorney's Office.

63. In creating false evidence against Mr. Marrero, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Marrero's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

64. As a direct and proximate result of this unlawful conduct, Mr. Marrero sustained the damages alleged herein.

## FIFTH CAUSE OF ACTION
*Malicious Prosecution*

65. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

66. The individual defendants initiated the criminal proceedings against Mr. Marrero by issuing and/or causing to be issued legal process against Plaintiff.

67. The individual defendants lacked probable cause to commence the criminal proceedings against Mr. Marrero.

68. The individual defendants' actions were motivated by actual malice.

69. The criminal proceedings were terminated in favor of Mr. Marrero on April 11, 2012.

70. As a direct and proximate result of this unlawful conduct, Mr. Marrero sustained the damages alleged herein.

## SIXTH CAUSE OF ACTION
*Failure to Intervene*

71. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

72. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

73. Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

74. As a direct and proximate result of this unlawful conduct, Mr. Marrero sustained the damages alleged herein.

SEVENTH CAUSE OF ACTION
*Equal Protection Clause under 42 U.S.C. § 1983*

75. Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

76. Mr. Marrero is a Hispanic-American.

77. The Defendants' conduct was tantamount to discrimination against Plaintiff based on his ethnicity. This disparate treatment caused Plaintiff to suffer serious injuries.

78. The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, frisk, and arrest Plaintiff.

79. The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

80. One of the programs at issue here is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and

remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

81. The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

82. The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

83. The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

84. According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black. Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics. By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops. The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

85. Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

86. Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

87. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

88. Trespassing arrests are one of the most effective means available for obtaining fingerprints and photographs from people never before entered in the criminal justice databases. Where those trespassing stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

89. Discrimination within the NYPD is so prevalent that it has spurred the enactment of Local Law 71, which allows members of the public to sue for being racially profiled as a result of the NYPD's stop and frisk program.

90.     As a result of the foregoing, Mr. Marrero was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and is thereby entitled to damages.

EIGHTH CAUSE OF ACTION
*Monell*

91.     Mr. Marrero repeats and re-alleges each and every allegation as if fully set forth herein.

92.     This is not an isolated incident.  Defendant City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Plaintiff.

93.     Defendant City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

94.     Defendant City of New York, through the NYPD, has a *de facto* quota/productivity policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

95.     This quota/productivity policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

96.     Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

97.     Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

98. Active officers are given promotion opportunities that are not afforded to inactive officers.

99. Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

100. The quota/productivity policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

101. Defendant City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

102. Defendant City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to properly counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

103. The failure of Defendant City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

104. Defendant City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

105. Defendant City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

106. Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

107. These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

108. Defendant City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

109. As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

110. Furthermore, the discriminatory pattern and practices by the NYPD, as set forth above, has furthered the quota and arrest policies of the NYPD.

111. Members of the NYPD are able to meet their quotas by preying on minorities, including Mr. Marrero.

112. By targeting these populations with impunity, members of the NYPD meet their quotas and also obtain guaranteed overtime pay as set forth above.

113. As such, Defendant City of New York actually rewards discriminatory behavior by providing guaranteed overtime to these officers without any oversight or limitations.

114. In fact, Defendant City of New York is estopped from asserting that such discrimination and tactics do not occur. In <u>Floyd, et al. v. The City of New York</u>, 08 Civ. 1034

(SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods." See Floyd, Docket Entry No. 373 at p. 180.

115. The Court goes on to find that Defendant City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant City of New York have been deliberately indifferent to the tactics used by NYPD's members. See id. at p. 181.

116. In a case dealing with similar issues involving the NYPD's Clean Halls program, the Court found that "[the evidence shows] that a nexus existed between the Clean Halls program and the kinds of unlawful trespass stops described by plaintiffs[.]" Ligon v City of New York, et al., 12 Civ. 2274 (AT) (S.D.N.Y. Jan. 8, 2013).

117. Here, as in Floyd, Mr. Marrero was stopped and frisked without reasonable suspicion or probable cause to do so under and pursuant to Defendant City of New York's policy and practice of executing such stops and frisks.

118. As well, as in Ligon, the defendants then used the impermissible stop and frisk policy to then effect the arrest of Mr. Marrero without any probable cause to do so, instead basing it upon reasons developed by Defendant City of New York's under its Clean Halls program and its practices and procedures.

119. Defendant City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

120. Defendant City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

121. These policies, practices, and customs were the moving force behind Mr. Marrero's injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alfredo Marrero respectfully requests judgment against Defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
November 2, 2014

/s/
Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
*Attorney for Plaintiff*
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com